UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CIVIL ACTION NO. 1:21-CV-00071-GNS-HBB

THOMAS J. BROWNING                                                    PLAINTIFF

v.

FRANKLIN PRECISION INDUSTRY, INC.                                    DEFENDANT

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendant's Motion for Summary Judgment (DN 52). The motion is ripe for adjudication. For the reasons that follow, the motion is **GRANTED**.

I.        STATEMENT OF FACTS AND CLAIMS

Plaintiff Thomas J. Browning ("Browning") was employed by Defendant Franklin Precision Industry, Inc. ("FPI") from November 2018 until September 2020. (Browning Dep. 28:7-11, Mar. 11, 2022, DN 61-1; Tanimura Decl. ¶ 8, DN 54-5). While employed with FPI, Browning served as a quality control manager and IATF Engineer in the Quality Department until his termination in September 2020. (Browning Dep. 28:10-11; Browning Dep. Ex. 15, DN 54-2; Tanimura Decl. ¶ 8).

During his employment at FPI, Browning discovered an unknown half-sister through a genealogy website's DNA test. (Browning Dep. 46:16-47:1). While Browning previously knew of his German ancestry from his mother's side of the family, he learned about his father's Czechoslovakian ancestry through his communications with his half-sister. (Browning Dep. 46:25-47:23). This discovery led Browning to discuss his German heritage with his co-workers and bringing different German foods to work. (Browning Dep. 48:8-49:20). Browning recalled

engaging in banter with a co-worker NASCAR fan, joking that a BMW vehicle would someday race American-made vehicles in NASCAR races.  (Browning Dep. 49:8-16).

In March 2019, FPI was made aware of sexual harassment allegations against Browning from a former temporary worker at FPI's facility.  (Browning Dep. Ex. 19, DN 54-2).  The temporary worker alleged that Browning asked to take her to dinner on numerous occasions "to reward [her] for all of the rework [she] had done."  (Browning Dep. Ex. 19).  The complainant also alleged that he sent her numerous text messages and nicknamed her "babyface" because of her young appearance.  (Browning Dep. Ex. 19).  While other employees at FPI noted that Browning may have given the temporary employee an unusual amount of attention, none of those employees corroborated the temporary employee's allegations of sexual harassment.  (Browning Dep. Ex. 19).  Browning denied the allegations, and after a several-day suspension, he received no further discipline for the alleged harassment and claims that HR manager Nickie Madden ("Madden") told him the allegations were unfounded.  (Browning Dep. 148:6-16, 173:11-174:8).

According to Browning, he made numerous reports to Madden of instances involving what he perceived as discriminatory behavior directed at him or others between June 2019 and November 2019.  (Browning Dep. 58:5-11).  Browning's first report involved an employee named Noah,[1] who purportedly ridiculed Browning regularly about his weight and patted Browning's belly—including making a reference to Browning consuming too many hamburgers.[2]  (Browning

---

[1] While Browning refers to a person named Noah repeatedly during his deposition, neither party has identified this person's surname or position within FPI.  During the deposition of Toshikazu Kanamori ("Kanamori"), he testified that did not recall patting Browning's belly.  (Kanamori Dep. 23:3-6, Mar. 16, 2022, DN 54-4).

[2] In the declaration of Kazuhiro Tanimura ("Tanimura"), who is the Director of Accounting and Administration for FPI, he states that he has reviewed FPI records and could not find any complaints of discrimination made by Browning.  (Tanimura Decl. ¶ 3).  In addition, he stated that Madden never conveyed any complaint she received from Browning.  (Tanimura Decl. ¶ 4).

Dep. 58:15-59:5). Browning also recalled an incident in which Japanese team members thought his use of a knee scooter following an ankle injury was comical, as they believed it was part of a Halloween costume. (Browning Dep. 59:7-22). Kanamori, a junior quality manager under Browning, said that he would buy Browning a BMW sticker for the scooter and "suggested that [Browning] could get some German BMW engineers to make [the] scooter more heavy-duty because of [his] weight." (Browning Dep. 52:17-21, 61:13, 196:18-23).

Browning testified that Japanese supervisors and employees made what he perceived as racist jokes on a regular basis. (Browning Dep. 60:10-62:14). He stated:

> They float these papers around all the time that are supposed to be internal private jokes. We've submitted one. But it's on FPI's confidential letterhead, and it talked about how the Japanese are a better culture than anyone else in the world. Like, okay, there's a Russian guy on a boat, and he sees somebody in the water and the Russian guy jumps in and says something, and then the American guy jumps in and says something else, and the Japanese guy stays on the boat, watches these other people jump. I mean, you got to have a copy of it somewhere. I mean, they float these jokes making fun of Americans all the time. There was one how the Japanese built a wooden chair and the chair is ten times better than anybody else because North Koreans will throw a bunch of wood at it and hope it became a chair; the South Koreans would wait for the Japanese to build it and take it apart and find a way to make it better. The Americans will wait for everybody else to build it and then we'd just buy it. The Germans will come in like gangbusters and blowup everybody's chairs and make their own chairs. I mean, those jokes floated around that place frequently.

(Browning Dep. 60:10-61:11).[3] Browning identified Kanamori as the one circulating the joke about Germans. (Browning Dep. 61:12-15). Browning was offended that Japanese supervisors

---

According to Browning, Madden was fired for performance issues while he was still employed by FPI. (Browning Dep. 104:12-13, 106:25-107:3).

[3] While not identical, Exhibit 5 from Browning's deposition is similar to his recollection of a circulated joke. (Browning Dep. Ex. 5, DN 54-2; Browning Dep. 64:22-65:22). During Kanamori's deposition, he was asked about a similar joke that read as follows:

> A luxury passenger ship with people from all over the world is sinking. However, compared to the number of passengers, the number of escape boats is not enough.

and employees thought the jokes were humorous.  (Browning Dep. 63:7-11).  Browning testified

that he thought "[i]t wasn't right.  These guys pass this stuff around like it was baseball cards."[4]

(Browning Dep. 63:17-19).  Browning claimed that he complained to Madden about the jokes.

(Browning Dep. 63:20-25).

In October 2019, several employees dressed like the members of *The Addams Family*

television series for a plant-wide costume contest.  (Browning Dep. 67:24-68:3).  Browning played

---

So the ship's captain tries to get the passengers into the sea.  So what's the word
the captain gave to jump into the country?

To Americans . . . "If you jump in, you can be a hero."
To the Russians . . . ["][T]here's a bottle of vodka in the sea.["]
To the Italians . . . "A beautiful woman is swimming in the sea."
To the French[] [. . .] "Never jump into the sea."
To the British . . . "A gentleman is the one who jumps into the sea at a time like
this."
To the Germans . . . "Please jump into the sea because it is a rule[.]"
For the Chinese . . . "Delicious food (fish) is swimming[.]"
To the Japanese . . . "Every one've [sic] already jumped in."·
To Koreans . . . "The Japanese have already jumped in."
For the North Koreans . . . ["][N]ow is their chance to run away rom [sic] your
country[.]["]

(Kanamori Dep. Ex. 1, DN 54-4).
[4] Kanamori acknowledged sharing the joke, which he had found on the internet and translated into
English.  (Kanamori Dep. 29:1-22).  He characterized it as a "very famous joke for [the] Japanese"
and expounded:

A.     . . . This is explanation document, why Japanese like same things.  (Court
reporter asks for clarification.)  Same things.  That's it.
Q.     Okay.· So what do you mean by "same things"?
A.     So for example, how to say, this is just example.· Same things.  Let me think
of example.  If someone succeed, if someone success, Japanese want to do same
things.  Make sense?
Q.     Talking about following others?
A.     Yes.  Following others, yes.

(Kanamori Dep. 29:9, 31:11-25).  Kanamori testified that this was the only joke he recalled sharing
and denied being counseled by Madden or anyone else about it.  (Kanamori Dep. 35:11-16, 36:2-
8).

the part of Uncle Fester and shaved all of his head and facial hair.  (Browning Dep. 68:2-7).

According to Browning, Kanamori said that Browning's portrayal made him look like a Nazi

because of the lack of facial hair.  (Browning Dep. 68:7-10).  That same day, Browning stated that

he raised concerns about this discriminatory conduct to Rick Jones ("Jones"), Director of

Operations/Plant Control Division.  (Browning Dep. 76:5-77:22).

Browning also testified that Japanese management disliked his haircut after he styled his

hair in a mohawk.  (Browning Dep. 71:4-72:1).  As a result, Browning claims that his travel was

restricted, and he complained about the restriction to Madden.  (Browning Dep. 72:2-14).

Browning testified that he also reported discriminatory treatment directed towards African

Americans.  He claimed that there were Japanese employees who did not like African Americans

and used a racial slur derogatory to African Americans.  (Browning Dep. 78:9-70:20).  Browning

claimed that he confronted Kanamori about his use of a racial slur and reported it to Madden.[5]

(Browning Dep. 79:12-80:5).  According to Browning, he did not recall any further use of the

racial slur from Kanamori.  (Browning Dep. 80:6-8).

Browning also contends that African American employees he favored for promotions

within his department were passed over by the decisionmakers.[6]  (Browning Dep. 80:9-13).  As

the QC Manager, Browning was tasked with completing the performance evaluations for the

members of his team, which were considered as part of the promotion process.  (Browning Dep.

---

[5] Kanamori denied using the racial slur alleged by Browning or being counseled by Madden about the use of the racial slur.  (Kanamori Dep. 23:9-11, 24:16-25:8).  Kanamori could not recall whether Browning ever discussed "words that are offensive to Americans" with him.  (Kanamori Dep. 25:9-13).

[6] Browning's characterization is contradicted by other evidence in the record.  According to Tanimura, Malina Partinger ("Partinger"), an African American female in Browning's department, was promoted, and the promotion was approved by Jones and Hiromi Kuno ("Kuno").  (Tanimura Decl. ¶ 5).  Browning asserted that Partinger was only promoted because he complained about the failure to promote African American employees.  (Browning Dep. 93:5-20).

82:12-23, 83:8-10).  Tanimura would then review the Browning's team evaluations, and according to Browning, Tanimura would direct him to lower the scores on the evaluations because "we do not like to promote black people."  (Browning Dep. 82:23-83:7, 83:14-84:1, 85:16-19, 92:7-20). Browning did not believe that this happened with all evaluations.  (Browning Dep. 211:10-11). Browning raised concerns with Madden about the requested changes and claimed that Madden agreed with his concerns.  (Browning Dep. 91:10-17, 97:13-23).

During the approximately six-month period in which Browning made reports of what he believed were discriminatory workplace conduct, FPI made a change to its timekeeping policy. As of August 26, 2019, all employees—including hourly and salaried employees—were required to clock in and clock out for their shifts.  (Browning Dep. Ex. 8, DN 54-2; Browning Dep. Ex. 13, DN 54-2; Browning Dep. 119:18-20, 124:16-18).  As a result, Browning, who was a salaried employee, was required to clock in and clock out.

On October 11, 2019, Browning discovered an internal part defect impacting FPI's biggest customer, and he notified the customer of the issue.  (Browning Dep. 95:9-15, 191:17-22). Because Browning had to attend his daughter's Girl Scout function that evening, he left work at 5 p.m. that day leaving two assistant quality managers and two quality engineers to address the issue. (Browning Dep. 155:10-23, 191:23-192:1).  On October 14, 2019, several members of management confronted Browning about leaving work as others were dealing with the defective part issue.  (Browning Dep. 191:23-192:3).

On November 12, 2019, Tanimura emailed Browning inquiring why Browning had not clocked in or out since September 10, 2019, despite being notified of the requirement for all employees.  (Browning Dep. Ex. 9, DN 54-2).  Two days later, Tanimura sent a follow-up email after Browning failed to respond.  (Browning Dep. Ex. 9).  In his reply, Browning stated:

> I have only one answer to give you.  I have not really thought about it being a priority given what the current situation of quality is right now.  I will try to remember to clock in and out.  That can be a bit tough seeing as I haven't had to clock in or out for the last 20 years or so.

(Browning Dep. Ex. 9).

On November 18, 2019, Jones gave Browning an oral warning for failing to comply with the clock-in/clock-out requirement for two months, which Jones documented in writing. (Browning Dep. Ex. 11, DN 54-2).  The form memorializing that meeting reflects that Browning refused to sign the document.  (Browning Dep. Ex. 11).  In his deposition, Browning denied ever seeing the form but acknowledged meeting with Jones about his noncompliance.  (Browning Dep. 133:13-136:10).

On December 9, 2019, Jones, Madden, and Hiromi Kuno, QC Senior Manager, met with Browning to discuss his work performance.[7]   (Browning Dep. 140:10-25).   A written memorandum signed by Jones and Kuno noted Browning's deficient performance included:  (i) failing to address issues like when he left work early on the day the defective parts issue was discovered; (ii) failing to complete tasks and leaving tasks partially completed; (iii) lacking the necessary skills for the QC Manager position; (iv) missing key deadlines; (v) failing to timely review "subordinates' work itself and job status"; and (vi) displaying work inconsistent with his supervisory role like arriving late to work.[8]  (Browning Dep. Ex. 16, DN 54-2).  During that same meeting, FPI offered Browning the position of IATF Engineer, which was a $20,000 reduction in

---

[7] Browning thought that Kanamori may have also attended this meeting.  (Browning Dep. 140:20-22).

[8] The parties dispute whether there was a prior meeting regarding Browning's performance issues. During discovery, FPI produced a document purporting to reflect the minutes from the prior meeting.  (Browning Dep. Ex. 10, DN 54-2).  Browning denied the meeting occurred or ever seeing the document before.  (Browning Dep. 130:11-131:23).

pay, in lieu of his termination.[9]  (Browning Dep. 95:19-23; Browning Dep. Ex. 15).  According to Browning, he initially rejected the demotion but signed the letter confirming his acceptance during a subsequent meeting on December 17, 2019.  (Browning Dep. 140:10-141:9; Browning Dep. Ex. 15).

On December 31, 2019, Browning filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").  (Browning Dep. Ex. 17, DN 54-2).  In the charge, Browning stated that he reported discriminatory behavior towards him and others between June 2019 and November 2019.  (Browning Dep. Ex. 17).  He claimed the reports went unaddressed, and he subsequently received a negative evaluation and demotion.  (Browning Dep. Ex. 17).

Between January 8 and 17, 2020, Browning was late to work four times.  (Browning Dep. Ex. 14, DN 54-2).  Two of the late arrivals were due to his wife's illness, and no explanation was noted for the other two tardies.  (Browning Dep. Ex. 14).  In March 2020, FPI furloughed most of its employees at the plant—including Browning—due to the impact of the COVID-19 worldwide pandemic on the automotive industry.  (Browning Dep. 164:15-165:5; Tanimura Decl. ¶ 6).  Ultimately, Browning's job was one of the positions eliminated as part of a reduction in force ("RIF")—including six others within the Quality Department—as a result of the pandemic.  (Browning Dep. 167:7-13, 234:1-3; Tanimura Decl. ¶¶ 6-8).  According to FPI, the elimination of the IATF engineer was a cost-saving measure, and the audit responsibilities have since been handled by a third-party consultant.  (Tanimura Dep. 36:13-15, 49:3-16, Mar. 16, 2022, DN 54-3;

---

[9] Browning testified that during the meeting, "Madden halted it because I was able to rebut every claim that they had against me with factual evidence.  She stopped the meeting, and at the end of that meeting, she said we can't do this.  He's got enough rebuttal."  (Browning Dep. 129:1-5).  If Madden was deposed, her transcript is not in the record.

Tanimura Decl. ¶ 6). Browning's last day as an employee of FPI was September 21, 2020. (Tanimura Decl. ¶ 8).

Browning filed this action against FPI alleging claims of retaliation, racial discrimination, and national origin discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") relating to his demotion, furlough, and termination.[10]  (Compl. ¶¶ 30-37, 47-57, DN 1).  In addition, he asserted a state common law claim for retaliatory discharge.  (Compl. ¶¶ 38-46).  Following discovery, FPI moved for summary judgment on the federal claims.  (Def.'s Mot. Summ. J., DN 52).

## II.  **JURISDICTION**

This Court has subject-matter jurisdiction of this matter based upon federal question jurisdiction.  *See* 28 U.S.C. § 1331.  In addition, the Court has supplemental jurisdiction over Browning's state law claim.  *See* 28 U.S.C. § 1367(a).

## III.  **STANDARD OF REVIEW**

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  To prevail, the moving party must "satisfy its burden [of showing] that there are no genuine issues of material fact simply 'by pointing out to the court that the [non-moving party], having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.'"  *Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005) (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)).  Similarly, the movant may meet its burden by

---

[10] In particular, Browning contends FPI took those actions because he is a white man of German and Czechoslovakian descent, and in retaliation for reporting workplace discrimination and filing the charge with the EEOC.  (Browning Dep. 161:2-7).

offering evidence negating an essential element of the non-moving party's claim.  *See Dixon v. United States*, 178 F.3d 1294, 1999 WL 196498, at *3 (6th Cir. 1999) (unpublished table decision).

After the movant either shows "that there is an absence of evidence to support the nonmoving party's case," or affirmatively negates an essential element of the non-moving party's claims, the non-moving party must identify admissible evidence that creates a dispute of fact for trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). While the Court must view the evidence in a light most favorable to the non-moving party, it "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Anderson*, 477 U.S. at 252.

## IV.   <u>DISCUSSION</u>

### A.   <u>Federal Claims</u>

Browning has asserted federal claims under Title VII for retaliation, racial discrimination, and national origin discrimination.  (Compl. ¶¶ 30-37, 47-57).

#### 1.   *Retaliation*

Under Title VII, it is unlawful for an employer to engage in retaliatory conduct when an employee engages in protected activity.  *See Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 373 (6th Cir. 2013); *see also* 42 U.S.C. § 2000e-3.  An employee engages in a "protected activity" when he or she opposes practices "made unlawful under Title VII."  *Brown*, 545 F. App'x at 373. Title VII prohibits employers from employment discrimination "because of [an] individual's race, color, religion, sex, or national origin . . . ."  42 U.S.C. § 2000e-2(a)(1).

Although Browning argues to the contrary, he has not identified any direct evidence of retaliation or his other claims, as discussed later.  *See Pelcha v. MW Bancorp, Inc.*, 455 F. Supp. 3d 481, 497 (S.D. Ohio 2020) ("'[D]irect' evidence is 'smoking gun' evidence 'that explains itself.'"  (citations omitted)); *see also Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997) ("It is the rare situation when direct evidence of discrimination is readily available . . . ." (citation omitted)).  Instead, he relies upon circumstantial evidence; thus, the Court will apply the burden shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), in analyzing this claim.  *See Scott v. Donahoe*, 913 F. Supp. 2d 355, 364 (W.D. Ky. 2012) (citing *Chen v. Dow Chem. Co.*, 580 F.3d 394, 402 (6th Cir. 2009)).

### a.    *Prima Facie* Case

To prove a *prima facie* claim of retaliation under Title VII, Browning must prove that:  "(1) he engaged in activity protected by Title VII; (2) the exercise of his civil rights was known to the defendant; (3) thereafter, the defendant took an employment action adverse to the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000) (citation omitted).  "The burden of establishing a prima facie case is not an onerous one."  *Lewis-Smith v. W. Ky. Univ.*, 85 F. Supp. 3d 885, 906 (W.D. Ky. 2015) (citing *Nguyen*, 229 F.3d at 563).

FPI contends Browning cannot meet this burden as to the causation element.  (Def.'s Mem. Supp. Mot. Summ. J. 15-20, DN 53).  Browning maintains he engaged in protected activities relating to his reporting of alleged discrimination to Madden during the term of employment and filing the EEOC charge that led to the adverse employment actions.  (Pl.'s Resp. Def.'s Mot. Summ. J. 14-17, DN 61).

### i.      Opposition

Title VII's opposition clause provides that it is "unlawful . . . for an employer to discriminate against any of his employees . . . because he has opposed any practice made . . . unlawful . . . by this [title] . . . ." 42 U.S.C. § 2000e-3(a).  To prevail on his retaliation claim based on the opposition clause, Browning must present evidence that he opposed FPI's unlawful practices "in a reasonable manner and with a reasonable and good faith belief that the practices violated Title VII." *Jackson v. Genesee Cnty. Rd. Comm'n*, 999 F.3d 333, 346 (6th Cir. 2021) (citing *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579 (6th Cir. 2000)).   "Examples of opposition activity protected under Title VII include 'complaining to anyone (management, unions, other employees, or newspapers) about allegedly unlawful practices; [and] refusing to obey an order because the worker thinks it is unlawful under Title VII.'"  *Id*. at 344-45 (alteration in original) (quoting *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 721 (6th Cir. 2008)).  The Sixth Circuit has further explained:

> While the plaintiff's allegations of protected activity do not need to "be lodged with absolute formality, clarity, or precision," the plaintiff must allege more than a "vague charge of discrimination."  The plaintiff also must express her opposition in a reasonable manner.  For example, "[a]n employee is not protected when he violates legitimate rules and orders of his employer, disrupts the employment environment, or interferes with the attainment of his employer's goals."  Finally, the plaintiff herself must have a "reasonable and good faith belief that the opposed practices were unlawful."

*Id*. at 345 (alteration in original) (internal citations omitted) (citation omitted).

Here, the adverse employment decisions involve Browning's demotion in December 2019, and his furlough and termination in March and September 2020, respectively, as part of the RIF.

### a)      Demotion

In seeking to meet his burden, Browning relies upon his reports of alleged discriminatory conduct at FPI between June and November 2019.  (Pl.'s Resp. Def.'s Mot. Summ. J. 14-16.)  He

contends that his demotion occurred close in time to his reports.  (Pl.'s Resp. Def.'s Mot. Summ. J. 16).

"Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation."  *George v. Youngstown State Univ.*, 966 F.3d 446, 460 (6th Cir. 2020) (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)).  Based on the evidence in this case, however, temporal proximity is not enough for Browning to meet his burden.

FPI challenges the sufficiency of the evidence to support the causation element on the basis that Browning has failed to show that the decisionmakers knew of his reports in opposition to alleged workplace discrimination.  (Def.'s Mem. Supp. Mot. Summ. J. 18-19).  Responding to FPI's motion, Browning has pointed to no evidence in the record identifying the decisionmakers and their knowledge of Browning's opposition.  (Pl.'s Resp. Def.'s Mot. Summ. J. 14-17).  As the Sixth Circuit has noted, "the decisionmaker's knowledge of the protected activity is an essential element of the prima facie case of unlawful retaliation."  *Proffitt v. Metro. Gov't of Nashville & Davidson Cnty.*, 150 F. App'x 439, 442 (6th Cir. 2005) (citation omitted).

Accordingly, Browning has failed to prove a *prima facie* case of retaliation relating to his demotion.  Summary judgment will be granted on this basis.

### b)      RIF

Browning's proof of causation as to his furlough and termination is even weaker, and he does not directly address this issue in response to FPI's motion, which is a concession that he cannot prove pretext.  *See Cunningham v. Tenn. Cancer Specialists, PLLC*, 957 F. Supp. 2d 899, 921 (E.D. Tenn. 2013) ("It is well understood . . . that when a plaintiff files an opposition to a

dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded." (citation omitted)).   Nevertheless, Browning's reports of discriminatory workplace conduct and his EEOC charge occurred more than two months before plant employees were furloughed due to the global pandemic and more than eight months before FPI ultimately terminated his employment.  The Sixth Circuit has recognized that an adverse action two months after a protected activity is insufficient to create an inference of retaliation as to the causation element.  *See Arendale v. City of Memphis*, 519 F.3d 587, 606 (6th Cir. 2008) (citation omitted).  Because Browning failed to meet his burden, summary judgment will be granted for FPI as to his retaliation claim based upon the furlough and termination.

### ii.    EEOC Charge

As to the EEOC charge, FPI contends Browning cannot rely on that complaint as the basis for retaliation because his demotion occurred before the EEOC charge.  (Def.'s Mem. Supp. Mot. Summ. J. 17 (citations omitted)).  Browning concedes that the demotion occurred before he filed the charge and that he continued to work for FPI after filing it.  (Pl.'s Resp. Def.'s Mot. Summ. J. 14 (citing Browning Dep. 142:10-14, 164:12-14)).  Thus, the EEOC charge does not support the element of causation as to Browning's demotion.

The 2019 EEOC charge was filed before Browning was furloughed in March 2020 along with most other plant workers and eventually terminated in September 2020.  Based on the record, Browning cannot rely on temporal proximity between the filing of his EEOC charge in late December 2019 and his furlough and termination.  The furlough occurred more than two months after the filing of the charge, and Browning's termination occurred an additional six months later.  Moreover, the Sixth Circuit has recognized that an adverse action two months after a protected activity is insufficient to create an inference of retaliation as to the causation element.  *See*

*Arendale*, 519 F.3d at 606 (citation omitted).  In this instance, more than two months elapsed from the filing of Browning's EEOC charge and his furlough and another six months before his ultimate termination.  As such, Browning cannot rely on temporal proximity to prove causation relating to the filing of the EEOC charge.

The Sixth Circuit has further recognized that "other facts [may] negate any inferences that may arise from temporal proximity between the protected activit[y] and [] [the adverse employment decision]." *Barrett v. Lucent Techs., Inc.*, 36 F. App'x 835, 843 (6th Cir. 2002).  In this instance, a worldwide emergency due the COVID-19 pandemic led to the temporary closure of businesses across the United States beginning in March 2020, and as Browning concedes, almost all FPI employees were subject to some period of furlough as result of the slowdown in the automotive industry caused by the pandemic.  (Browning Dep. 164:15-165:5; Tanimura Decl. ¶ 6).  Ultimately, Browning's position was one of many positions were eliminated—including others within his department—due to the pandemic and its impact on the automotive industry.  (Browning Dep. 167:7-13, 234:1-3; Tanimura Decl. ¶¶ 6-8).  Thus, he has failed to prove the causation element in light of the intervening global pandemic and the furlough of numerous employees within his department.

Thus, Browning has failed to prove the causation element of his *prima facie* case to the extent that he relies on the EEOC charge of discrimination.  FPI is entitled to summary judgment to the extent that Browning relies on the EEOC charge in proving a claim of retaliation based on his furlough and termination.

### b.    Legitimate, Nondiscriminatory Reasons

Assuming that Browning had met his initial burden, FPI had to articulate a legitimate, nondiscriminatory reason for its employment decisions. *See Johnson*, 215 F.3d at 581.  FPI asserts

that Browning was demoted for performance issues, that he was furloughed because of the COVID-19 pandemic, and that Browning's position in the Quality Department was one of many positions in the department which were ultimately eliminated.  (Def.'s Mem. Supp. Mot. Summ. J. 13-15; Def.'s Reply Mot. Summ. J. 7-8, DN 62).

Poor job performance is a legitimate, nondiscriminatory reason for an adverse employment decision.  *See Danielson v. City of Lorain*, 938 F.2d 681, 683 (6th Cir. 1991); *see also id.* at 684 ("Workers who poorly perform their jobs will not be insulated from dismissal simply because they are members of [a] protected [] group.").  In addition, numerous courts have recognized that pandemic-related personnel decisions also satisfy this burden.  *See, e.g.*, *Wormald v. Overhead Door Corp.*, No. 5:21-CV-00585, 2022 WL 7579793, at *6 (N.D. Ohio Oct. 13, 2022) ("[B]usiness concerns over the Covid-19 pandemic and associated reductions in workforce are also legitimate, nonretaliatory reasons for Wormald's ultimate termination—especially given the reduction in workforce would have occurred regardless of Wormald's taking FMLA leave because of ongoing uncertainty with a global pandemic."); *Berry v. Airxcel, Inc.*, No. 20-1362-KHV, 2022 WL 2952511, at *7 (D. Kan. July 26, 2022) ("Though plaintiff argues that the COVID-19 pandemic caused defendant's demand to increase in June of 2021, defendant has articulated a legitimate, non-discriminatory reason for the reduction in force in March of 2020 and plaintiff's subsequent termination."  (citation omitted)); *Mooney v. Roller Bearing Co. of Am., Inc.*, No. C20-01030-LK, 2022 WL 1014904, at *16 (W.D. Wash. Apr. 5, 2022) ("Mooney does not dispute that RBC determined that it needed to institute a RIF based on business realities, including the COVID-19 pandemic and its resulting impact on the business, or that RBC laid off numerous other employees too.  A reduction in force is a legitimate, non-discriminatory reason for termination . . . ."  (citation omitted)); *Eliassaint v. RTG Furniture Corp.*, 551 F. Supp. 3d 1293, 1307 (M.D. Fla. 2021) ("RTG

has successfully articulated legitimate, nondiscriminatory reasons for furloughing Eliassaint—COVID-19 and its seniority policy—and awarding him certain bonuses—his work performance." (citation omitted)); *Davis v. Leonard Aluminum Util. Bldgs., LLC*, No. 2:20-CV-0515, 2021 WL 4898070, at *7 (S.D. W. Va. Oct. 20, 2021) (noting the plaintiff's failure to "offer any evidence disputing Leonard's need to conduct the RIF due to the economic and financial uncertainty brought on by the COVID-19 pandemic.").

For these reasons, FPI has met its burden as to both Browning's demotion and termination as part of the RIF.

### c. Pretext

Because FPI has met its burden, the ultimate burden shifts to Browning to "demonstrate by a preponderance of the evidence that the legitimate reason offered by [] [FPI] was not its true reason, but instead was a pretext designed to mask retaliation." *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 544 (6th Cir. 2008) (citation omitted). To meet this burden, a plaintiff may present evidence showing that: "(1) the employer's stated reason for [the adverse employment decision] . . . has no basis in fact, (2) the reason offered for [the adverse employment decision] was not the actual reason for the [decision], or (3) the reason offered was insufficient to explain the employer's action." *Id.* at 545 (citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)).

### i. Demotion

In arguing pretext, Browning asserts that the evidence shows that he was qualified for his position and that he was demoted in response to his opposition to the discriminatory acts in the workplace. (Pl.'s Resp. Def.'s Mot. Summ. J. 16-17). "Pretext, however, cannot be shown by attacking the decision itself." *Hein v. All Am. Plywood Co.*, 232 F.3d 482, 490 (6th Cir. 2000)

(citations omitted).   In other words, "a plaintiff's subjective interpretations or feelings are insufficient to establish pretext." *Rosenthal v. Faygo Beverages, Inc.*, 701 F. App'x 472, 480 (6th Cir. 2017) (citation omitted); *see also Holobaugh v. Tennessee*, 25 F.3d 1048, 1994 WL 252883, at *3 (6th Cir. 1994) (unpublished table decision) ("[T]he plaintiff's bald denial of wrongdoing [i]s insufficient evidence to establish pretext." (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992))).

While contending that he reported discriminatory acts between June 2019 and November 2019, Browning points to no specifics of alleged discriminatory acts occurring during that time. It is not entirely clear when the acts occurred, to whom the acts were reported (besides Madden), and what manager knew of the alleged discriminatory acts.   Most importantly, as noted above, Browning has not identified which the decisionmakers were responsible for his demotion and whether they knew of his opposition activity.[11]  *See Shorter v. Magneti Marelli of Tenn., LLC*, No. 1:18-CV-00090, 2020 WL 1980981, at *8 (M.D. Tenn. Apr. 27, 2020) ("Shorter's failure to identify the respective decisionmakers also raises the specter of questionable 'me too' evidence, involving the treatment of different employees by different supervisors for different issues.   This, in turn, raises a host of issues unaddressed by Shorter's filings, 'such as temporal and geographical proximity, whether the various decisionmakers knew of the other decisions, whether the employees were similarly situated in relevant respects, or the nature of each employee's allegations of [discrimination].'" (alteration in original) (internal citation omitted) (citation omitted)).   Absent

---

[11] In support of his response, Browning only filed the transcript from his deposition.   During his deposition, Browning identified generally various individuals involved in making hiring decisions, but he did not identify who made the decision to demote or furlough him.   (Pl.'s Resp. Def.'s Mot. Summ. J. 3 (citing Browning Dep. 53:23-54:5)).   The December 9, 2019, memorandum relating to Browning's performance issues was signed by Jones and Kuno.   (Browning Dep. Ex. 16).

any such evidence, Browning cannot show his efforts opposing discrimination were a factor considered by the decisionmakers in demoting him, which is fatal to his retaliation claim.

Browning's repeated reliance on statements he attributes to Madden and others must be viewed with some skepticism—especially it is not supported by the testimony of others in the record.[12]   *See Okojie v. Metro. Nashville Hosp. Auth.*, 584 F. Supp. 3d 543, 552 n.13 (M.D. Tenn. 2022) ("'[When ruling on a motion for] summary judgment, the Court merely decides, as a matter of law, whether a jury could reasonably conclude that the evidence presented is credible . . . .'  In so doing, the Court keeps in mind that even unsupported and self-serving statements can be credible under certain circumstances, although '[t]he Court views self-serving testimony opposing a motion for summary judgment with scrutiny when it is unsupported by additional evidence.'" (second alteration in original) (internal citation omitted) (citation omitted)).   While Browning asserts that Madden met with Kanamori to discuss his use of racial slurs, Kanamori denied using such slurs or being counseled about that matter.  (Pl.'s Resp. Def.'s Mot. Summ. J. 15 (citing Browning Dep. 70:5-6); Kanamori Dep. 23:29-11, 24:16-25:8).   In addition, Browning's self-serving statement that Madden told Jones during the early December 2019 meeting that FPI lacked the necessary evidence to demote Browning because none of the performance issues were true is not otherwise supported by any evidence in the record—except for the fact that Browning did not

---

[12] Similarly, Browning purportedly kept a journal in which he wrote selective recollections of the events that transpired.  (Browning Dep. 182:3-197:2; Browning Dep. Ex. 20, DN 54-2).  In its reply, FPI challenges any reliance on Madden's statements recounted by Browning throughout this case as hearsay.  (Def.'s Reply Mot. Summ. J. 3-4).  In its reply, however, FPI cites *Back v. Nestlé USA, Inc.*, 694 F.3d 571 (6th Cir. 2012), in which the Sixth Circuit noted that "[a] statement is not hearsay under Rule 801(d)(2)(D) when it concerns a matter within the scope of the declarant's employment—there is no requirement that a declarant be directly involved in the adverse employment action."  *Id.* at 577 (citing *Carter v. Univ. of Toledo*, 349 F.3d 269, 275-76 (6th Cir. 2003)).

accept the demotion until December 17, 2019.  (Pl.'s Resp. Def.'s Mot. Summ. J. 16 (citing Browning Dep. 149:4-18, 142:22-143:2); Browning Dep. Ex. 15).

While Browning disagrees with FPI's recitation of performance issues, he does not dispute that he had numerous absences and tardies, failed to clock in and clock out for two months, and left other employees to handle the defective parts issue for a major customer.  His contention that his demotion was not warranted for those performance issues is not evidence of pretext.  As the Sixth Circuit has noted, "a case alleging unlawful retaliation is not a vehicle for litigating the accuracy of the employer's grounds for [an adverse employment action].  Instead, the employee also must offer some evidence that not only were the employer's reasons false, but that retaliation was the real reason for the adverse action." *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)).  Browning has failed meet his burden to prove pretext as to his demotion.

### ii.    RIF

Likewise, Browning has failed to prove pretext as to the RIF.  In his response, he does not address his burden relating to the retaliation claim, which is a concession that he cannot prove pretext as to the RIF.  *See Cunningham*, 957 F. Supp. 2d at 921 (citation omitted).  As Browning acknowledged, he was not the only person who was not recalled following the furlough.[13] (Browning Dep. 167:7-13).  He noted that six others within the Quality Department lost their jobs as part of the RIF.  (Browning Dep. 167:7-13).  According to FPI, the elimination of the IATF engineer was a cost-saving measure implemented in 2020, with the audit responsibilities contracted to a third-party consultant.  (Tanimura Dep. 36:13-15, 49:3-16; Tanimura Decl. ¶ 6).

---

[13] The racial demographics of the employees discharged in the FPI's RIF were:  "four white males, four white females, one black female, and one Asian male."  (Tanimura Decl. ¶ 6).  The record does not reflect the national origin of these employees.

Browning has failed to present proof refuting this reason for the RIF. Thus, he cannot show pretext on this basis. *See Cuthbertson v. First Star Logistics, LLC*, No. 3:21-cv-00616-FDW-DSC, 2022 WL 16625588, at *4 (W.D.N.C. Nov. 1, 2022) ("The undisputed evidence shows Defendant decided to eliminate[] ] Plaintiff's position as a result of the impact of the COVID-19 pandemic . . . ." (citation omitted)).

For these reasons, Browning has failed to meet his burden to prove pretext. FPI is entitled to summary judgment as to Browning's retaliation claim.

## 2. Title VII – Racial Discrimination/National Origin Discrimination[14]

FPI also seeks summary judgment on Browning's racial and national origin discrimination claims. (Def.'s Mem. Supp. Mot. Summ. J. 9-15). The Supreme Court has explained:

> [Title VII] makes it "an unlawful employment practice for an employer . . . to fail or refuse to hire . . . any individual . . . because of such individual's race, color, religion, sex, or national origin." . . . The term "national origin" on its face refers to the country where a person was born, or, more broadly, the country from which his or her ancestors came.

*Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 88 (1973) (internal citation omitted). Browning is Caucasian and of German and Czechoslovakian ancestry.[15] (Browning Dep. 46:25-47:23).

Like the retaliation claim, this claim is not supported by direct evidence. As a result, the *McDonnell Douglas* burden shifting applies in addressing both claims. *See White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008).

---

[14] Because the parties have addressed these claims together and the elements are similar, the Court will do the same.

[15] In his response to FPI's motion, Browning mentions his Czechoslovakian ancestry once but otherwise fails to address how he was discriminated against based on this ancestry. Accordingly, he has conceded that he cannot prove pretext in this regard, and FPI is entitled to summary judgment on the national origin claim based on Browning's Czechoslovakian ancestry. *See Cunningham*, 957 F. Supp. 2d at 921 (citation omitted). Because Browning has effectively waived this claim related to his Czechoslovakian ancestry, the Court must determine whether his national origin claim based upon his German ancestry can proceed to trial.

### a. *Prima Facie* Case

To prove a *prima facie* claim of racial or national origin discrimination, Browning must prove that: "(1) he is a member of a protected class; (2) he was qualified for his job; (3) he suffered an adverse employment decision; and (4) he was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees." *Id.* (citation omitted). This burden, however, "'is not onerous, and poses 'a burden easily met.'" *Cline v. Cath. Diocese of Toledo*, 206 F.3d 651, 660 (6th Cir. 1999) (internal citation omitted) (citation omitted).

Because one of the adverse employment actions challenged is Browning's termination as part of a RIF, the fourth element of the *prima facie* case is modified for that action. "A work force reduction situation occurs when business considerations cause an employer to eliminate one or more positions within the company." *Passmore v. Mapco Express, Inc.*, 447 F. Supp. 3d 654, 666 (M.D. Tenn. 2017) (quoting *Bell v. Prefix, Inc.*, 321 F. App'x 423, 428 (6th Cir. 2009)). "In a RIF case, a plaintiff must show 'additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons.'" *Peeples v. City of Detroit*, 891 F.3d 622, 634 (6th Cir. 2018) (quoting *Barnes v. GenCORP Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990)). As the Sixth Circuit has explained:

> "Appropriate statistical data showing an employer's pattern of conduct toward a protected class as a group can, if unrebutted, create an inference that a defendant discriminated against individual members of the class." To create that inference, "the statistics must show a significant disparity and eliminate the most common nondiscriminatory explanations for the disparity."

*Id.* at 635 (internal citation omitted) (citation omitted).

FPI contends that Browning cannot show that he was qualified for the QC manager position from which he was demoted or that he was replaced by someone outside his protected class. (Def.'s Mem. Supp. Mot. Summ. J. 12). In addition, FPI asserts that Browning cannot prove the

fourth element of his *prima facie* case relating to the furlough and termination because the position
was never filled.  (Def.'s Mem. Supp. Mot. Summ. J. 12).

### i.      Qualification

FPI contends that Browning was not qualified for the QC Manager position because of his
history of poor job performance, relying on Browning's poor job performance as the legitimate,
nondiscriminatory for its adverse employment action.  (Def.'s Mem. Supp. Mot. Summ. J. 12-13).
Browning insists that he has met his burden.  (Pl.'s Resp. Def.'s Mot. Summ. J. 17-21).

As this Court has explained:

> The Sixth Circuit has cautioned that courts must not use the "qualified" element of
> the prima facie case to heighten the plaintiff's initial burden, however.  To ensure
> that the first two stages of the *McDonnell Douglas* inquiry remain analytically
> distinct, Sixth Circuit precedent requires "that the 'qualified' prong of the prima
> facie case be evaluated in light of the plaintiff's employment record 'prior to the
> onset of the events that the employer cites as its reason' for its decision."    Thus,
> "when assessing whether a plaintiff has met h[is] employer's legitimate
> expectations at the prima facie stage of a termination case, a court must examine
> [the] plaintiff's evidence independent of the nondiscriminatory reason 'produced'
> by the defense as its reason for terminating plaintiff."

*Pettway v. Logistics Sols. Grp., Inc.*, No. 3:17-CV-73-DJH-CHL, 2020 WL 981712, at *11 (W.D.
Ky. Feb. 28, 2020) (alterations in original) (emphasis omitted) (internal citation omitted) (quoting
*Cline*, 206 F.3d at 660-61).  Thus, it is inappropriate for FPI to rely on the performance issues it
asserts were the basis for the adverse employment decision to challenge whether Browning can
show he was qualified.

Instead, a court's focus in determining whether the plaintiff can prove a *prima facie* case
should be "on a plaintiff's *objective* qualifications to determine whether he or she is qualified for
the relevant job."  *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 575 (6th Cir. 2003)
(citations omitted).  In making that determination, "the inquiry should focus on criteria such as the
plaintiff's education, experience in the relevant industry, and demonstrated possession of the

required general skills." *Id.* at 576.  To meet his burden, Brown points to FPI's decision to hire

him for the QC Manager position and his resume, which he testified about during his deposition.

(Pl.'s Resp. Def.'s Mot. Summ. J. 20-21; Browning Dep. 18:8-28:3).  Thus, the record reflects that

Browning has met his burden to show that he was qualified with respect to his demotion.

### ii. Replacement or Different Treatment than a Similarly-Situated Non-Protected Employee

The parties also dispute the fourth element—whether Browning's replacement was outside

of his protected class, or whether he was treated differently than a similarly-situated non-protected

employee.  Each party points to different evidence in the record.

FPI contends that Browning's replacement as QC Manager was a white employee who was

moved into that position, but FPI has not cited any evidence in the record to support that

assertion.[16]  (Def.'s Mem. Supp. Mot. Summ. J. 12 (citing Tanimura Dep. 35)).  In contrast, during

Kanamuri's deposition, he tacitly acknowledged that his LinkedIn profile reflects that he held the

position of QC Manager.  (Pl.'s Resp. Def.'s Mot. Summ. J. 21 (citing Kanamori Dep. 39:1-9)).

Thus, construing the evidence in the light most favorable to Browning, the issue of whether

Kanamori was Browning's replacement is a question of fact that a jury would have to resolve, and

Browning has met his burden as to his demotion.

Browning, however, does not address his burden as to the fourth element applicable to the

RIF—"evidence tending to indicate that the employer singled out the plaintiff for discharge for

impermissible reasons." *Peeples*, 891 F.3d at 634 (internal quotation marks omitted) (citation

omitted).  Absent any evidence presented by Browning to show that Browning was singled out by

---

[16] While FPI represents that Tanimura testified as to the replacement employee's race during his deposition, that is not reflected in the limited pages provided from the transcript or the specific page cited by FPI.

FPI for the RIF due to his race or national origin, he has failed to prove this essential element of his *prima facie* case.  *See id.*  Accordingly, FPI is entitled to summary judgment on Browning's racial and national origin discrimination claims arising from the RIF.

### b.  Legitimate, Nondiscriminatory Reasons

If Browning had met his burden, the burden would then shift to FPI to articulate a legitimate, nondiscriminatory reason for each of the challenged adverse employment decisions. *See White*, 533 F.3d at 391-92 (citations omitted).  FPI has presented evidence that it demoted Browning for his poor performance.  (Def.'s Mem. Supp. Mot. Summ. J. 13-15; Def.'s Reply Mot. Summ. J. 7-8).  In addition, FPI has presented evidence that COVID-19 pandemic caused the furlough of most FPI employees at that plant, with  numerous employees in the Quality Department being terminated due to the RIF and the audit responsibilities delegated to a third-party vendor. (Def.'s Mem. Supp. Mot. Summ. J. 13-15; Def.'s Reply Mot. Summ. J. 7-8; Tanimura Dep. 36:13-15, 49:3-16; Tanimura Decl. ¶ 6).  Thus, FPI has met its burden for both Browning's demotion and termination due to the RIF.

### c.  Pretext

Finally, Browning has the ultimate burden of proving that FPI's stated reasons were pretextual.  *See White*, 533 F.3d at 391-92 (citation omitted); *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 812 (6th Cir. 2011) (citation omitted).  As the Sixth Circuit has explained:

> Pretext may be established "either directly by persuading the [trier of fact] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  A plaintiff will usually demonstrate pretext by showing that the employer's stated reason for the adverse employment action either (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action.  However, the plaintiff may also demonstrate pretext by offering evidence which challenges the reasonableness of the employer's decision "to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation."

*White*, 533 F.3d at 392-93 (alteration in original) (internal citations omitted) (citation omitted).

### i.       Demotion

Browning's response focuses on proving that FPI's stated reasons for his demotion were a pretext for racial and national origin discrimination.  (Pl.'s Resp. Def.'s Mot. Summ. J. 22-26).  In arguing pretext, Browning mainly focuses on attacking FPI's stated reasons for his demotion, and the only evidence he cites in addressing pretext is his own deposition testimony.

The fact that Browning subjectively believed that he did not deserve the demotion he received or disagreed with the validity of FPI's stated reasons for the demotion is not evidence of pretext.  (Pl.'s Resp. Def.'s Mot. Summ. J. 25 (citations omitted)).  Browning's disagreement with FPI's assessment of his performance as QC Manager does not negate facts that he concedes— including that he did not clock in or clock out for a period of two months, or that he left work during a significant production emergency involving a major customer of FPI.

Likewise, it is uncontested that Browning was late and missed work on numerous occasions.  Regardless of whether Browning had legitimate reasons for those attendance issues, he has not shown that his absences did not impact his performance or others.

Browning points to alleged statements made by Jones excusing Browning's failure to clock in and clock out, but those statements are not otherwise supported by the evidentiary record.  (Pl.'s Resp. Def.'s Mot. Summ. J. 25 (citing Browning Dep. 135:21-23, 136:1-3)).  He also continues to point to his self-serving statements attributed to Madden, which—as discussed above—are not otherwise supported by the evidentiary record to support his claim that the demotion was a pretext for racial or national origin discrimination.  (Pl.'s Resp. Def.'s Mot. Summ. J. 26 (citing Browning Dep. 141:4-14)).

In the absence of any other evidence, Browning effectively invites this Court to act a super personnel board to second guess the business judgment of FPI, which this Court must not do.  *See Haughton v. Orchid Automation*, 206 F. App'x 524, 534 (6th Cir. 2006) (noting that "Title VII was not intended to diminish traditional management prerogatives," and courts "cannot sit as a super-personnel department."   (internal quotation marks omitted) (internal citation omitted) (citation omitted)).

For these reasons, Browning has failed to meet his burden to show pretext as to his demotion.  FPI's motion will be granted on that basis.[17]

## ii.      RIF

Browning's response is silent as to whether he has presented evidence to show pretext based on race or national origin relating to his termination as part of the RIF.  Because he has waived this issue, FPI is entitled to summary judgment on Browning's racial and national origin discrimination claims relating to the RIF.  *See Cunningham*, 957 F. Supp. 2d at 921 (citation omitted).

---

[17] To the extent that Browning relies upon discriminatory statements made in the workplace to prove pretext, he does not discuss these statements in addressing what evidence may prove pretext. It is well-established that stray remarks made by non-decisionmakers are not proof of discriminatory intent.  *See Tooson v. Roadway Express, Inc.*, 47 F. App'x 370, 375 (6th Cir. 2002) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989)); *see also Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 355 (6th Cir. 1998) ("In assessing the relevancy of a discriminatory remark, we look first at the identity of the speaker.  An isolated discriminatory remark made by one with no managerial authority over the challenged personnel decisions is not considered indicative of [] discrimination."  (citation omitted)); *Roberts v. Principi*, 283 F. App'x 325, 332 (6th Cir. 2008) ("[T]he discriminatory or retaliatory animus of a coworker is not usually relevant to whether the employer violated Title VII.  Rather, the relevant beliefs or motivations are those of the actual decisionmaker, usually a supervisor or manager."  (citations omitted)).  From the record, it is unclear who the decisionmakers were, and Browning has not identified any discriminatory remark made by any decisionmaker regarding his race or national origin.

B.    <u>**State Law Claim**</u>

Browning also has asserted a state law claim for common law retaliatory discharge. (Compl. ¶¶ 38-46).  However, neither party addresses this cause of action in the filings relating to the pending motion.  To the extent that this claim is still pending, the Court declines to exercise supplemental jurisdiction over the claim.  *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction . . . .").

## V.    <u>CONCLUSION</u>

For the foregoing reasons, **IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment (DN 52) is **GRANTED**, and Plaintiff's federal claims are **DISMISSED WITH PREJUDICE**.  To the extent that the state law claim is still pending, the Court declines to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c)(3), and the state law claim of retaliatory wrongful discharge is **DISMISSED WITHOUT PREJUDICE**.  The Clerk shall strike this matter from the active docket.

Greg N. Stivers, Chief Judge
United States District Court

March 30, 2023

cc:    counsel of record